**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| CAMPUS INVESTMENTS, INC., ) | |
| ) | |
| Plaintiff, ) | Case No. 08-cv-3835 |
| v. ) | |
| ) | Judge Milton I. Shadur |
| LAKE COUNTY STORMWATER ) | |
| MANAGEMENT COMMISSION, and ) | Magistrate Judge Michael T. Mason |
| LAKE COUNTY, ILLINOIS, ) | |
| ) | |
| Defendants. ) | |
| ) | |

**MEMORANDUM IN SUPPORT OF PRELIMINARY INJUNCTION**

COMES NOW the plaintiff Campus Investments Inc., by and through its attorney, submits this memorandum in support of its Motion for Preliminary Injunction enjoining and restraining the Defendants from enforcing county wetland regulations within the plaintiff's subdivision located in the Village of Grayslake and in support states as follows:

I. **BACKGROUND FACTS**.

The facts are set forth in the Verified Complaint (ECF Dkt #5) and summarized as follows. Campus Investments, Inc., ("Campus") is the owner of 28.48 acres on Rollins Road (the "Property") in the Village of Grayslake (the "Village"). (Compl. ¶ 25). About 11.7 acres is an **isolated wetland** outside the Army Corps of Engineers jurisdiction. (Compl. ¶ 25, 27).

The Village approved a Special Use Permit for the development of a 25-lot **subdivision named Autumn Ridge** on the Property. (Compl. ¶ 28). The subdivision left 54% of the Property in open space. (*Id.*) After the Village approved the SUP, Lake County

Stormwater Management Commission ("SMC") notified Campus that "SMC's approval of isolated wetland impacts (or a no wetland impact determination) is required prior to the Village's issuance" of a permit. SMC seeks to redesign the approved Autumn Ridge subdivision, by **requiring more than 54% open space**. (Compl. ¶ 29-33).

Campus is not asking to fill all wetlands on the land. It has agreed to preserving 54% of the land in open space conservation. The Village and the prior property owner agreed to such an arrangement fifteen years ago. A comparison of the Autumn Ridge wetland delineation with the one at the time of annexation shows that the two "resemble" each other, Autumn Ridge 15.33 acres vs 13.40 acres at annexation. See Exhibits A and B.

The Village approved the importation of fill onto the Property and Campus installed a silt fence in anticipation of importing fill. (Compl. ¶ 37-38). On May 27, 2008, SMC's Principal Wetland Specialist, inspected the Property and told Campus to "**stop all work**." (Compl. ¶ 39). On June 10, 2008, the Village of Grayslake gave approval for Campus to import fill onto the Property. (Compl. ¶ 40). On June 16, 2008 Campus started importing fill onto the Property using the existing access on Rollins Road. (*Id*.) On June 18, 2008 the Defendants, under threat of arrest, **installed a fence along the front of the Property** to prevent all access, and all use of the Property. (*Id*.)

II.     **STANDARD FOR ISSUANCE OF INJUNCTIVE RELIEF**.

In the Seventh Circuit in "order to obtain a preliminary injunction, the moving party must show that: (1) they are reasonably likely to succeed on the merits; (2) no adequate

remedy at law exists; (3) they will suffer irreparable harm which, absent injunctive relief, outweighs the irreparable harm the respondent will suffer if the injunction is granted; and (4) the injunction will not harm the public interest. If the movant can meet this threshold burden, then the inquiry becomes a 'sliding scale' analysis where these factors are weighed against one another." *Joelner v. Village of Wash. Park*, 378 F.3d 613, 619 (7th Cir. 2004).

III. **THERE IS AN OVERWHELMING LIKELIHOOD THAT PLAINTIFF WILL PREVAIL ON THE MERITS OF THIS LAWSUIT AT TRIAL.**

This burden is relatively light, in "the preliminary injunction context, a 'likelihood of success' exists if the party seeking injunctive relief shows that it has a 'better than negligible' chance of succeeding on the merits." *Meridian Mut. Ins. Co. v. Meridian Ins. Group*, 128 F.3d 1111, 1114 (7th Cir. 1997).

A. **COUNT 1 DECLARATORY RELIEF**.

Following back-to-back floods in northeastern Illinois, the Illinois General Assembly enacted 55 ILCS 5/5-1062 granting stormwater management powers to northeastern Illinois counties. The legislative purpose is identified in § 5-1062(a) as follows: "The **purpose** of this Section is to allow management and mitigation of the effects of urbanization on **stormwater drainage** in metropolitan counties" the "**purpose** of this Section shall be achieved by: (1) consolidating the existing **stormwater management** framework into a united, countywide structure; (2) setting minimum standards for **floodplain and stormwater management**; and (3) preparing a countywide plan for the **management of stormwater runoff**, including the management of natural and man-made drainageways."

The legislation provides that a "stormwater management planning committee shall be established" by the county. 55 ILCS 5-1062(b). "The principal duties of the committee shall be to develop a **stormwater management plan**." § 5-1062(b). The "county board may prescribe by ordinance reasonable rules and regulations for **floodplain** management and for governing the location, width, course and release rate of all **stormwater** runoff channels, streams and basins in the county." § 5-1062(f). However, the "county **shall not enforce** rules and regulations adopted by the county **in any municipality**" that "has a municipal stormwater management ordinance" consistent with the county's ordinance. § 5-1062(k).

After SMC was established, they ultimately developed, and Lake County adopted, the Lake County Comprehensive Stormwater Management Plan. Lake County also enacted a Watershed Development Ordinance ("WDO"), and **amended it seven times**; the last one in 2006. See www.co.lake.il.us/elibrary/publications/smc/wdo2006_appcmod.pdf. On January 9, 2001 the Supreme Court issued its opinion in *Solid Waste Agency of Northern Cook County v. Army Corps of Eng.*, 531 U.S. 159 (2001) which held that isolated wetlands are not within the Army Corp's jurisdiction.[1] Seven months after the decision, SMC amended the WDO and redefined wetlands to include the protection of isolated wetlands.

---

[1] SMC's Tech Dev. Manual § 5.1 notes that "until January 9, 2001, wetlands were regulated by the Corps under authority of the federal CWA. On that date, the Supreme Court ruled on the *Solid Waste Agency of Northern Cook County* ("*SWANCC*") case and that ruling effectively **removed the Corps' authority to regulate intrastate, isolated waters/wetlands** not tributary to a navigable waterway. These isolated waters/wetlands represent thousands of acres within Lake County that became at risk for destruction with the *SWANCC* ruling. On August 14, 2001, the Lake County Board amended the [Watershed Development] Ordinance to **protect isolated waters/wetlands within the county that were no longer regulated the Corps** and defined them as Isolated Waters of Lake County."

The WDO defines "Isolated Waters of Lake County" as all "**wetlands** that are **not under U. S. Army Corps** of Engineers jurisdiction." (Apx. A pg 71). The WDO requires a permit for impacts to isolated wetlands, and limits impacts to 1/10 acre, impacts greater than 1/10 require mitigation. (Art. IV § E.4). The WDO requires specialists certified by SMC to delineate wetlands (Art. IV § E.2-3) and also provides that "SMC will perform Certified Wetland Specialist duties for communities." (Art. III § B.12).**²**

The determination of whether the WDO is within the scope of authority granted to Lake County by the legislature is guided by the following principles: "Counties . . . shall have only powers granted to them by law." Illinois Constitution Art. VII, § 7. "Counties" can "exercise **only those powers expressly granted** to them by the **legislature**." *Redmond v. Novak*, 427 N.E.2d 53, 57-58 (Ill. 1981). The "powers" of "counties, are **not to be enlarged** by liberally construing the statutory grant, but, quite to the contrary, are to be **strictly construed** against the governmental entity." *Inland Land Appr. Fund v. County of Kane*, 800 N.E.2d 1232, 1236 (Ill. App. 2003). "In interpreting a statute, it is never proper for a court to **depart from plain language** by reading into a statute exceptions, limitations, or conditions which **conflict** with the clearly expressed legislative intent." *County Knox v. The Highlands, L.L.C.*, 723 N.E. 2d 256, 263 (Ill. 1999).

---

² "Jurisdictional wetland determinations are required for all proposed developments in Lake County." (Storm. Mgmt. Plan § 3.2.4)."Applications requiring isolated wetland review must also be forwarded to SMC unless the community is specifically certified to perform this review. Currently, only four jurisdictions have applied to be certified for isolated wetland review. Thus, SMC must increase its resources to **provide isolated wetland services for a majority of the county's jurisdictions**." (Storm. Mgmt. Plan § 4.2.4.1).

### (a). **LAKE COUNTY IS WITHOUT EXTRATERRITORIAL AUTHORITY TO REGULATE WETLANDS WITHIN INCORPORATED VILLAGES.**

.
The enabling legislation uses the word stormwater fifty-one times; the word wetlands is conspicuously absent from § 5-1062. The legislative purpose is identified in § 5-1062(a) as floodplain and stormwater management, and not wetland management.[3] 55 ILCS 5/5-1062(f) provides that the "county board may prescribe by ordinance reasonable rules and regulations for **floodplain management** and for governing the location, width, course and release rate of all **stormwater runoff channels**, streams and basins in the county."

The plain reading of § 5-1062(f) confirms that Lake County enlarge the stormwater and floodplain authority and included wetlands. "A wetland is not a floodplain." *Village of Elk Grove Village v. Evans*, 997 F.2d 328 (7th Cir. 1993). The "powers" of "counties, are not to be enlarged" but "strictly construed." *Inland Land Appreciation Fund*, 800 N.E.2d at 1236.

55 ILCS 5/5-1062(j) provides that the a county "may, after 10 days written notice to the owner or occupant, enter upon any lands or waters within the county for the purpose of **inspecting stormwater facilities** or causing the removal of any obstruction to an affected watercourse." The WDO enlarge the § 5-1062(j) limitation of inspections to "stormwater facilities" and included the inspection of wetlands and erosion.

---

[3] 55 ILCS 5/5-1062(a) states the legislative purpose as follows: "The **purpose** of this Section shall be achieved by: (1) consolidating the existing **stormwater** management framework into a united, countywide structure; (2) setting minimum standards for **floodplain** and **stormwater** management; and (3) preparing a countywide plan for the management of **stormwater** runoff, including the management of natural and man-made drainageways."

55 ILCS 5/5-1062(k) provides that "the **county shall not enforce** rules and regulations adopted by the county in any municipality" that has a "municipal stormwater management ordinance that is consistent" with the county ordinance. "Grayslake is a certified community for approval and enforcement of the standard (stormwater management) provisions of the WDO." (Compl Ex. A-C). The WDO departs from the plain language of § 5-1062(k) and allows the county to enforce its regulations in the village in direct "conflict with the clearly expressed" statutory language. *County Knox*, 723 N.E. 2d at 263.

A comparison of the villages and county's subdivision and zoning powers confirms that the county has no extraterritorial authority to regulate wetlands within villages. Villages have exclusive authority to establish "standards of design for subdivisions" including requirements for "storm water drainage." 65 ILCS 5/11-12-5. And exclusive zoning authority "within the corporate limits" including the power to regulate "storm or floodwater runoff channel or basin." 65 ILCS 5/11-13-1. The county's subdivisions authority is limited to land "not being within" any "village." 55 ILCS 5/5-1041. County zoning is limited to land "outside the limits" of "villages." 55 ILCS 5/5-12001.

"[E]xtraterritorial governmental powers may only be conferred by the legislature." *County of Will v. City of Naperville*, 589 N.E.2d 1090, 1093 (Ill. App. 1992). The "legislature has granted extraterritorial jurisdiction in limited circumstances." *City of Springfield v. Judith Jones Dietsch Trust*, 746 N.E.2d 1272, 1274 (Ill. App. 2001). The "courts have never permitted a municipality's extra-territorial powers to supersede the governmental unit's exercise of zoning power over land within its own territory." *Aurora National Bank v. City of Batavia*, 414 N.E.2d 916, 920 (Ill. App. 1980).

In *Wauconda Fire Prot. Dist. v. Stonewall Orchards*, 828 N.E.2d 216 (Ill. 2005) the fire districts ordinance required a sprinkler system, the County's building code did not. *Id.* at 219-20. The county could not rely on the Fire Protection District Act (70 ILCS 705/11) for authority because the term "municipalities" did not include "county" and the county could not enforce its fire prevention code against the property. *Id.* at 223-25.

In *Pesticide Public Policy Foundation v. Village of Wauconda*, 622 F. Supp. 423 (N.D. Ill. 1985) the state pesticide statutes did not delegating authority to villages. The village ordinance imposed additional requirements on individuals who wished to apply pesticides. The court declared the ordinance invalid and enjoined the defendants from enforcing the ordinance. The Seventh Circuit affirmed, 826 F.2d 1068 (7th Cir. 1987).

55 ILCS 5/5-1062 is of limited authority. First, it is limited to five counties "served by the Northeastern Illinois Planning Commission." § 5/5-1062(a). Second, it "specifically denies and limits the exercise of any power which is inconsistent herewith by home rule units." § 5/5-1062(o). Third, it "does not prohibit the concurrent exercise of powers consistent herewith." § 5/5-1062(o). Fourth, "the county shall not enforce rules and regulations adopted by the county in any municipality" that has a consistent "stormwater management ordinance." § 5/5-1062(k). Fifth, the county may after ten days written notice, enter lands for the limited "purpose of inspecting stormwater facilities." § 5/5-1062(j). Sixth, the county regulations are limited to "rules and regulations for floodplain management" and the "location, width, course and release rate of all stormwater runoff channels, streams and basins in the county." § 5/5-1062(f).

The Defendants reading of the statute would **give them a blank check** to enact whatever rules and regulations they deem proper. The Defendants have relied on the statute to enact wetland regulation, land planning, and erosion control. The Defendants even rely on the stormwater statute to license village engineers, wetland scientists and erosion inspectors. The plain reading of § 5/5-1062 does not expressly give the Defendants these powers. Nor does the power arises by implication. It simply does not exist.

The WDO provisions that regulate wetlands conflict with the legislative purpose identified in § 5-1062(a), the wetlands provisions are an unlawful expansion of the limited authority granted over stormwater in § 5-1062(f), and an unlawful expansion of the limited authority over stormwater inspections granted in § 5-1062(j), and in direct conflict with § 5-1062(k) by retaining jurisdiction after a municipality has adopted a consistent stormwater ordinance, and are therefore invalid, unconstitutional and unenforceable as applied to the Autumn Ridge subdivision. Campus has shown a "better than negligible" chance of succeeding on the merits at trial with regards to Count 1 for Declaratory Relief.

B.    **DUE PROCESS VIOLATION (COUNT 3)**

The Supreme Court in *Nollan v. California Coastal Commn*, 483 U.S. 825 (1987) held that there must be an "essential nexus" between an exaction and the government purpose and if the problems created by a development are not substantially related, the exaction "is not a valid regulation of land use but '**an out-and-out plan of extortion**.'" *Id*, at 837.

The Supreme Court in *Dolan v. City of Tigard*, 512 U.S. 374 (1994) reaffirmed that the "absence of a nexus" will convert an exaction into "**an out-and-out plan of extortion**" *id*, at 387, and then went further, holding that even if an essential nexus exists the exaction is still unconstitutional unless there exists a "rough proportionality" between the project's impact and the exaction. *Id.*, at 391. Moreover, the burden rests on the municipality to make an "individualized determination" that the exaction "is related both in nature and extent to the impact of the proposed development." *Id.*, at 391.

The *Dolan* court stated that under the doctrine of "unconstitutional conditions" the "government may not require a person to give up a constitutional right -- here the right to receive just compensation when property is taken for a public use -- in exchange for a discretionary benefit conferred by the government where the benefit sought has little or no relationship to the property." *Id*, at 385. The *Dolan* court concluded that a "strong public desire to improve the public condition [will not] warrant achieving the desire by a shorter cut than the constitutional way of paying for the change." *Id.*, at 396.

The defendants efforts to preserve wetlands is without statutory authority. This is not a valid regulation of land use but an out-and-out plan of extortion by requiring wetlands to be left in open space under fear of economic harm. Campus has a constitutional right to be free from the extortion of wetlands without compensation, and Campus is in fear of economic harm, and possible bankruptcy, due to the Defendants preservation of wetlands without statutory authority. Campus has shown a "better than negligible" chance of succeeding on the merits at trial with regards to Count 3 for Due Process violation.

C. **EQUAL PROTECTION VIOLATION (COUNT 4)**

In *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) when the plaintiff asked to hook her house to the public water, the Village demanded a 33 foot easement while others similarly situated had only been asked to grant a 15 foot easement. *Id.* 563. The Court found "that the Village's demand was 'irrational and wholly arbitrary" sufficient "to state a claim for relief under traditional equal protection analysis." *Id.* at 565. In *City of Monterey v. Del Monte Dunes at Monterey*, 526 U.S. 687 (1999) the city denied numerous requests of the developer to develop a residential subdivision. The Court noted "Del Monte Dunes' equal protection argument that it had received treatment inconsistent with zoning decisions made in favor of owners of similar properties..." *Id* at 705.

Campus received treatment inconsistent with decisions in favor of owners of similar properties who agreed to preserve wetlands. Campus has shown a "better than negligible" chance of succeeding on the merits with regards to Count 4.

D. **FIRST AMENDMENT RETALIATION (COUNT 5)**.

Access to the courts has long been recognized as a "fundamental constitutional" right. *Bounds v. Smith*, 430 U.S. 817, 828 (1977); see *California Motor Transport Company v. Trucking Unlimited*, 404 U.S. 508, 510 (1972) ("right of access to the courts is . . . one aspect of the right of petition"); *United Mine Workers v. Illinois State Bar Ass'n*, 389 U.S. 217, 222 (1967) (right to petition is among the "most precious of liberties safeguarded by the Bill of Rights"). State officials may not retaliate against individuals because they exercise their constitutional right to seek judicial relief. E.g., *Silver v. Cormier*, 529 F.2d 161, 163 (10th

Cir. 1976) (threat to withhold monies due and owing because of a lawsuit on an unrelated matter was unconstitutional retaliation); *Cleggett v. Pate*, 229 F. Supp. 818, 821-22 (N.D. Ill. 1964) (individual entitled to "free and unhampered access to the courts").

"An act taken in retaliation for the exercise of a constitutionally protected right is actionable under § 1983 even if the act, when taken for a different reason, would have been proper." *Lekas v. Briley*, 405 F.3d 602, 614 (7th Cir. Ill. 2005). "An individual's constitutional right of access to the courts cannot be impaired, either directly or indirectly, by threatening or harassing an individual **in retaliation for filing lawsuits**." *Harrison v. Springdale Water & Sewer Comm'n*, 780 F.2d 1422, 1428 (8th Cir. 1986) (citation omitted).

The timing and nature of the fencing of the access is suspicious. Lake County approved major access to Rollins Road for Autumn Ridge ten months earlier. Also, the land has access to Rollins Road for decades. Campus was not asking to install the subdivision roads, or to do work on the county road. Moreover, the importation of fill was approved by the Village. The fencing of the property was likely for retaliatory purposes and the Campus has made a sufficient showing that they installed the fence in retaliation for initiating litigation in this case. Campus has shown a "better than negligible" chance of succeeding on the merits at trial with regards to Count 4.

E. **TAKING WITHOUT COMPENSATION (COUNT 6)**.

Ill. Const. Art. 1 § 15 "guards not only against a governmental taking of property, but also against governmental damage to property." The Illinois Takings Clause (Ill. Const. art. I, § 15) protects against the "taking" and for any "damage to property" and therefore

"provides greater guarantees to landowners against takings than the parallel guarantee provided under the fifth" amendment. *St. Lucas Ass'n v. City of Chicago*, 571 N.E.2d. 865, 875 (Ill App 1991).

SMC desired more than 54% of the Property be left in its natural state. However, the loss of additional acreage would make development of Autumn Ridge financially unfeasible. (Compl ¶ 39). Also, SMC did not make any individualized determination that the preservation of more than 54% of Autumn Ridge is related both in nature and extent to the impact of the proposed development. (Compl ¶ 40).

Under the Illinois takings clause, the federal rough proportionality test is increased to proof that the requirement is directly proportional and SMC must show that the land that it seeks to remain in open space is "specifically and uniquely attributable" to the proposed impact of the development. *Pioneer Trust & Savings Bank v. Mount Prospect*, 176 N.E.2d 799, 802 (1961). Under this standard, if the SMC cannot demonstrate that its exaction of preserving more than 54% is directly proportional to the specifically created need, the exaction becomes "a veiled exercise of the power of eminent domain and a confiscation of private property behind the defense of police regulations." *Id.* at 802. See also, *Amoco Oil Company v. Village of Schaumburg*, 661 N.E.2d 380 (Ill App 1995) (exaction of 20% of the land as a condition of zoning approval was held a regulatory taking).

Lake County's fencing of the property is the "quintessential physical invasion of private property" *Amoco Oil Company*, 661 N.E.2d at 389. Campus has shown a "better than negligible" chance of succeeding on the merits at trial with regards to Count 5. Campus has met it's burden of showing that **it has a chance of succeeding** on the merits at trial.

IV.  **NO ADEQUATE REMEDY AT LAW EXISTS**.

Campus has exhausted all administrative remedies available to compel the Defendants to allow Campus to develop the Autumn Ridge subdivision as approved by the Village of Grayslake. Campus has no adequate remedy at law for the injuries which Campus has suffered and will continue to suffer in the future.

The February 21, 2006 Special Use Permit provides that Campus "will not seek and do not have the right to seek to recover a judgment for monetary damages against the Village." WDO Art. VIII provides that the "provisions shall not create liability on the part of the Stormwater Management Commission nor any Certified Community nor any officer or employee thereof for any claims, damages or liabilities that result from reliance on this Ordinance or any administrative decision lawfully made thereunder." Lake County Highway Ordinance § 3.13 requires Campus to "indemnify, and save harmless and defend the Lake County Department of Transportation and the County, its officers, agents, and employees against all loss, damage, or expense that it or they may sustain as a result of any suits, actions, or claims of any character."

Additionally, it will also be impossible for Campus to determine the precise amount of damages, and even if those damages are ascertained it may be too late to save Campus from imminent demise in bankruptcy. Campus has no adequate remedy at law for the injuries which it has suffered and will continue to suffer in the future unless the Defendants wrongful conduct is restrained and enjoined.

V. **PLAINTIFF WILL UNQUESTIONABLY SUFFER IRREPARABLE INJURY IF THE PRELIMINARY INJUNCTION IS NOT ISSUED**.

The purpose of a preliminary injunction is to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits. See *American Hosp. Supply Corp. v. Hospital Prod. Ltd.*, 780 F.2d 589, 594 (7th Cir. 1985) ("premise of the preliminary injunction is that the remedy available at the end of trial will not make the plaintiff whole.")

Generally to establish irreparable harm, the injury must be one requiring a remedy other than money damages. However, in *Doran v. Salem Inn, Inc*, 422 U.S. 922, 932 (1975) the Supreme Court held that the issuance of a preliminary injunction was proper because "absent preliminary relief [the plaintiffs'] would suffer a substantial loss of business and perhaps even bankruptcy. Certainly the latter type of injury sufficiently meets the standards for granting interim relief, for otherwise a favorable final judgment might well be useless."

In *Sperry International Trade, Inc. v Government of Israel*, 670 F.2d 8, 12 (2nd Cir 1982) the court held that "[m]onetary loss might constitute irreparable injury in the exceptional case where a movant shows that the loss would force him into bankruptcy." In *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 971 (2nd Cir 1989) the "Plaintiffs' showing of the partnerships' danger of bankruptcy. . . .had adequately demonstrated to the district court the required irreparable harm." In *Pinnacle Nursing Home v. Axelrod*, 719 F. Supp. 1173, 1181 (W.D. NY 1989) the court held that "To require plaintiffs to delay these motions until bankruptcy is imminent would render their preliminary relief from harm a Pyrrhic victory. Such harm affronts justice when it is effected." In

*Transamerica Insurance Finance Corp. v. North American Trucking Assoc., Inc.*, 937 F. Supp. 630, 636 (W.D. KY 1996) the Court held that "the threat of bankruptcy" to plaintiff "constitute irreparable harm" and "if not restrained pending final judgment in this matter, bankrupt the plaintiff without any benefit to the defendants or to the general public."

The "loss of First Amendment freedoms for even minimal periods of time, unquestionably constitutes irreparable injury."*Elrod v. Burns*, 427 U.S. 347, 373-374 (1976). There is no question that if constitutional interests are threatened or in fact being impaired at the time injunctive relief is sought, a preliminary injunction is appropriate. *Elrod v. Burns*, 427 U.S. 347, 373-74 (1976); *Foster v. Kusper*, 587 F. Supp. 1191, 1194 (N.D.Ill. 1984). Unless an injunction is issued, the restraint on Campus will not be brief, and the interference with Campus fundamental right of access to the courts will continue.

To require Campus to delay until bankruptcy is imminent would render any future relief a an empty victory. As the Seventh Circuit noted in *Anderson v. USF Logistics*, 274 F.3d 470, 478 (7th Cir., 2001) to "demonstrate irreparable injury, [the plaintiff] must show that she will suffer harm that cannot be prevented or fully rectified by the final judgment after trial."

The threat of bankruptcy adumbrates the irreparable harm in this case, making this the exceptional case where the continued denial of the right to commence construction will force Campus into bankruptcy. Also, without access the property is without any beneficial or productive use, which also constitutes irreparable harm. See *Southland Corp. v. Froelich*, 41 F. Supp. 2d 227, 242 (E.D.N.Y. 1999) ("property owner's inability to make productive use of its own property may constitute irreparable harm.")

Campus has **obtained approval from the Village** to develop Autumn Ridge and has also obtained interim approval to import fill onto the Property. However, Lake County has **denied access** to county roads, and **SMC seeks to redesign** the approved Autumn Ridge subdivision, by requiring more than 54% open space. Unless the Defendant's wrongful conduct is restrained and enjoined, it may be too late to save Campus from imminent demise in **bankruptcy**. This is the exceptional case where the continued denial of the right to commence construction will force Campus into bankruptcy. Campus will suffer imminent, irreparable harm absent the granting of an injunctive relief from this Court. Considering the dynamics of the present real estate market, and the threat of bankruptcy, it is apparent that Campus has made an extremely strong showing of irreparable injury.

Another reason favoring injunctive relief is the limitation of time within which Campus must proceed to develop the subdivision. Campus has already labored for more than four years, and litigating this action on the merits will take a year, or more, and this delay will deny any remedy for the Defendant's desire to regulate outside statutory limits.

It is inconceivable that the development of Autumn Ridge, which is **approved by the Village**, will cause the Defendants to suffer any type of injury of an irreparable nature if, during the time prior to a full hearing, construction is commenced in accordance with the Village approved plans. Because the Defendant's will not suffer any hardship this favors preliminary injunctive relief pending a decision on the merits.

VI.     **THE INUNCTION WILL NOT HARM THE PUBLIC INTEREST**.

Campus is not asking to fill all wetlands on the land. It has agreed to preserving 54% of the land in open space conservation. The Village and the prior property owner agreed to such an arrangement fifteen years ago.

The economic benefits of the Autumn Ridge subdivision area also in the public interest. The public interest is also better served by a preliminary injunction that ensures compliance with Village regulations. Campus does not challenge the statutory authority, on the contrary, Campus urges that the Defendants **comply with the statute as written**. Forcing the Defendants to comply with the statute as written is in the public interest.

When a violation of constitutionally protected rights is shown, most courts hold no further showing of irreparable injury is required. *Associated Gen. Contractors of Calif. v. Coalition for Economic Equity*, 950 F.2d 1410, 140 (9th Cir 1991). The presumption of irreparable injury is particularly strong in cases involving infringement of First Ament rights. *Elrod v. Burns*, 427 US 347, 373 (1976). Having shown that the **Village approved the Autumn Ridge subdivision**, and that the Defendants lack jurisdiction to regulate the subdivision, it is apparent that an injunction will not be adverse to the public interest. An injunction will not be adverse to the public interest as the public has a vital interest in the vigorous enforcement of legislative enactments.

VII.  **ISSUANCE OF AN INJUNCTION WILL PRESERVE THE STATUS QUO**.

Preservation of the status quo is one of the most common bases for issuance of a preliminary injunction. Cases fairly uniformly conclude that where, as here, irreparable injury is present, the crucial question is that of whether a failure to issue the preliminary injunction would cause decidedly greater hardship to Campus, than to the Defendants, and whether the effect of the preliminary injunction could be undone if Campus ultimately loses at trial. Those factors all point to issuance of a preliminary injunction here.

Campus has **obtained approval from the Village** to develop the 25-lot Autumn Ridge subdivision. The Defendants lack the statutory authority to require modifications to the Autumn Ridge subdivision pursuant to the WDO's wetland regulations. The Army Corps will not regulate the wetlands. Besides, the Autumn Ridge subdivision has already left 54% of the land in open space, and the Defendants lack the authority to require more open space.

The Defendants seek to change the status quo pending trial by obtaining authority to regulate the Autumn Ridge subdivision which is wholly located within the Village of Grayslake. The Defendants do not have any such authority. The purpose of a preliminary injunction is to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits. This purpose is furthered by issuance of a preliminary injunction allowing Campus to proceed with the subdivision pursuant to Village approvals. The Defendants instead desire to halt Campus from developing a subdivision approved by the Village. The injury to Campus would clearly outweigh any perceived injury to the Defendants. The balance of hardships favors Campus as failure to issue the injunction will cause decidedly greater hardship to Campus than to the Defendants.

VIII. **CONCLUSION**.

In balancing the hardships in the present case, there can be no question that the scales tip overwhelmingly toward Campus. The Defendant's can show no hardship whatsoever from the granting of an injunction, while the **harm** that would come to Campus from the denial of injunctive relief would be both **substantial and irreparable**.

WHEREFORE, For all the foregoing reasons, the Plaintiff prays that this Honorable Court issue a preliminary injunction enjoining and restraining the Defendants, their employees, agents, attorneys, servants and anyone acting on their behalf, from regulating the wetlands within the Autumn Ridge subdivision.

Dated: July 9, 2008          Respectfully submitted,

          *Sebastian Rucci*
          Sebastian Rucci (ND IL No. 90785689)
          40 The Ledges, 3C
          Youngstown, Ohio 44514
          Phone: (330) 707-1182
          Fax:   (330) 707-1882
          Email: SebRucci@Gmail.com
          Attorney for the Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that on July 9, 2008, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties via the Court's electronic filing system and parties may access this filing through the Court's Case management/Electronic Case Files (CM/ECF) found on the internet at https://ecf.ilnd.uscourts.gov.

*Sebastian Rucci*
Sebastian Rucci (ND IL No. 90785689)